AO 91 (Rev. 11/11) Criminal Complaint

| AUSA: | Andrew J. Yahkind | Telephone: (313) 226-9565 |
|---|---|---|
| Special Agent: | Paul E. Dunham | Telephone: (313) 348-9783 |

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

United States of America
v.
Darren Robinson

Case No.

Case: 2:23−mj−30260
Assigned To : Unassigned
Assign. Date : 6/23/2023
Description: RE: SEALED MATTER (EOB)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __2015 to present__ in the county of __Oakland and Macomb__ in the __Eastern__ District of __Michigan, and elsewhere__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

*Complainant's signature*

Paul E. Dunham, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence and/or by reliable electronic means.

Date: June 23, 2023

*Judge's signature*

City and state: Detroit, MI

Hon. David R. Grand, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Special Agent Paul Dunham, being first duly sworn, hereby depose and state as follows:

## AGENT BACKGROUND

1. I make this affidavit in support of a criminal complaint and arrest warrant charging DARREN ANTHONY ROBINSON with wire fraud in violation of 18 U.S.C. § 1343.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI) in Detroit, Michigan and have been employed as a federal investigator for 18 years. I am a Certified Public Accountant and am certified in financial forensics. I am currently assigned to the Complex Financial Crimes squad. My duties and responsibilities include investigating violations of the United States Code concerning financial crimes. During my career, I have conducted numerous criminal investigations and have been trained in the methods and traits commonly associated with financial crimes.

3. This affidavit is based on my personal knowledge, my training and experience, and information obtained from other law enforcement officials. This affidavit is merely intended to establish probable cause for a criminal complaint charging DARREN ANTHONY ROBINSON with wire fraud in violation of 18

1

U.S.C. § 1343 and does not set forth all the facts known to me or other law enforcement officers regarding this matter.

## PROBABLE CAUSE

4. In 2022, federal law enforcement agencies began investigating "QYU Holdings" and related entities (collectively, "QYU"). QYU is a purported investment company. ROBINSON is the principal and main operator of QYU.

5. As part of its investigation, law enforcement obtained documentation purporting to be generated by QYU, including marketing materials, representations of historical performance results, trading activity, and investor account statements.

6. These materials showed that QYU purported to be a "boutique professional trading firm which specialize[d] in the commodities and foreign exchange markets" and had been generating incredibly high returns for its investors. For example, one document indicated that a $100,000 investment into one of QYU's funds in 2014 would have grown to over $2 million by 2021. That document also asserted that the same QYU fund did not have a single "net" losing monthly return (i.e., a return to the investor minus account fees that was not positive) during that same period.

7. QYU's marketing materials represented that its "strength in trading, or QYU's 'edge', is built on our exceptional understanding and analysis of the nuances of the US economy and our expert skill in dealing with financial markets."

2

QYU claimed that "the majority of our trade entries involve pairing the US dollar with one of the other seven major currencies."

8. Other QYU investor solicitation materials included the following written representations:

    a. QYU operated from Panama and the Cayman Islands.

    b. QYU did not charge a management fee. Rather, QYU earned a 30% "performance fee," paid from the trading profits earned.

    c. QYU maintained a "high water mark," with no performance fee paid to QYU if investors did not earn more than a certain amount in profit from QYU's trading activity.

9. Federal law enforcement agents interviewed individuals with knowledge about QYU, including Witness 1 (a non-investor in QYU) and Victim 1 (an investor in QYU).[1] Witness 1 is a resident of the Eastern District of Michigan. Witness 1 originally learned of QYU from a QYU investor and then obtained additional information regarding QYU from an individual soliciting funds on its behalf.

---

[1] Victim 1 and Witness 1's identities are known to law enforcement but not included in this publicly filed document to protect their identities.

10. Federal law enforcement agents interviewed Witness 1 in March 2022 and he said that an individual soliciting funds for QYU made the following representations to him:

    a. QYU had operations in Panama and Miami, Florida, with approximately $100 million under management.

    b. Investors were guaranteed a gross return of 3% per month on their invested funds.

    c. QYU earned a 30% fee, paid from the trading profits earned.

11. Witness 1 also provided federal law enforcement agents with QYU investor documentation that reflected trading activity profits, deductions of QYU's 30% performance fee, and "high water mark" language.

12. In March 2023, federal law enforcement agents interviewed Victim 1. Victim 1 is a resident of the Eastern District of Michigan. Victim 1 indicated that he invested over $1 million in principal with QYU since 2019. Victim 1 said that individuals soliciting funds for QYU had made the following representations to him:

    a. QYU had operations in Panama and the Cayman Islands.

    b. QYU did not take any portion of the investor's investment principal for a finder's fee or any other purpose.

    c. QYU made a profit on the majority of its trading activity and generated a return on the invested funds.

    d. QYU earned a 30% fee, paid from the trading profits earned.

13. In 2022-2023, federal law enforcement utilized legal process to obtain records for QYU accounts at multiple financial institutions in the United States. Preliminary analysis of records from 2015 to 2022 revealed hundreds of wire transfer deposits from apparent investors, totaling more than $70 million in incoming funds to QYU accounts. The wire transfer instructions/notes for these transfers included the following remarks: QYU Investment; FOREX Acct Setup; Currency Investment; FOREX Investing; and Foreign Exchange Trading.

14. The wire transfer records, as well as other records obtained by federal law enforcement, show that QYU's investors reside in the United States, Canada, and several other countries.

15. Federal law enforcement has identified dozens of apparent QYU investors from southeast Michigan, who, collectively, appear to have invested tens of millions of dollars into QYU. Many of these investments took place within the

last five years and involved wires from the Eastern District of Michigan to QYU bank accounts in other states.

16. Federal law enforcement's preliminary analysis of QYU's bank records revealed activity consistent with a Ponzi-scheme fraud. Notably, the bank records showed that newer deposits from QYU investors were the primary source of funds to make payments to other QYU investors. Further, there was no apparent QYU bank account activity reflecting significant fund deposits to, or withdrawals from, trading accounts. The records also showed significant fund transfers to individuals who appeared to be affiliated with QYU, including millions of dollars of transfers from QYU bank accounts benefiting ROBINSON. For example, these transfers included more than $800,000 for the purchase of a property in the United Arab Emirates for ROBINSON.

17. On June 20, 2023, ROBINSON participated in a voluntary, non-custodial interview with law enforcement officers, including your affiant, in New Jersey. ROBINSON's retained counsel was present at the interview. ROBINSON provided the following information:

    a. ROBINSON is the principal responsible for the operations of QYU.

    b. QYU operated in Panama, and later the Cayman Islands, from approximately 2010 to present.

c. During that period, ROBINSON, operating as QYU, solicited, via a network of client managers, funds from investors. ROBINSON communicated with QYU client managers and others acting on QYU's behalf, who then communicated with investors and informed them that the funds would be invested in the global foreign currency exchange market ("FOREX"). Investors were also told their full investment principal would be traded in FOREX and not reduced for any sort of fee or commission. Robinson admitted that investors were also told QYU earned a 30% performance fee, paid from the FOREX trading profits.

   i. ROBINSON admitted that the above representations to QYU's investors, which he acknowledged he caused to be made, were false. ROBINSON stated that a small volume of investor funds were traded in FOREX, but that activity did not come close to utilizing the full investment principal from the investors.

d. To create the appearance of legitimate operations, ROBINSON created fictitious FOREX trading data and caused QYU to provide, via electronic transmission/access, account statements to investors that were materially false.

e. ROBINSON estimated he caused investors to invest $100 million with QYU. ROBINSON said that he caused investors in the United States, including a high concentration in the Detroit, Michigan area, as well as Canada, and numerous other countries, to invest with QYU. Investors generally remitted their investment funds via wire transfer to QYU accounts at financial institutions in the United States.

f. Robinson admitted that the vast majority of the $100 million that was raised from QYU investors, was not used for trading activity, even though the investors had been told that their money would be used for trading. Instead, investor funds were used to pay distributions to other investors, pay QYU's business expenses,

compensate QYU's client managers and employees, and fund ROBINSON's lifestyle.

g. ROBINSON admitted that investor principal was the main cash flow source used to make distributions to investors. ROBINSON stated that, contrary to the representations made to investors, there were no significant FOREX trading profits generated by QYU because there was no significant FOREX trading activity by QYU.

18. ROBINSON's statements to law enforcement confirmed what QYU's bank records appeared to indicate: QYU is a massive Ponzi scheme.

## Conclusion

19. Based on the foregoing, there is probable cause to believe that DARREN ANTHONY ROBINSON has engaged in wire fraud, in violation of 18 U.S.C. § 1343.

## REQUEST FOR SEALING

20. It is further requested the Court order that all papers in support of this application, including the affidavit and arrest warrant, be sealed until further order of the court. These documents discuss an ongoing criminal investigation that is

neither public nor known to all potential targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets the opportunity to destroy or tamper with evidence, change patterns of behavior, notify potential co-conspirators, or otherwise seriously jeopardize the investigation.

_____
Special Agent Paul Dunham
Federal Bureau of Investigation

Sworn to before me and signed in my presence
And/or by reliable electronic means.

_____   Dated:  June 23, 2023
Hon. David R. Grand
United States Magistrate Judge